**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Monarch Content Management LLC, *et al.*, | No. CV-19-04928-PHX-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| Arizona Department of Gaming, *et al.*, | |
| Defendants. | |

At issue is Plaintiffs' Application for Temporary Restraining Order with Notice (Doc. 20, Mot.), to which Defendants filed a Response (Doc. 46, Resp.) and Plaintiffs filed a Reply (Doc. 49, Reply). The Court heard oral argument on Plaintiffs' Application on October 30, 2019, at which time the Court converted the Application to a Motion for Preliminary Injunction. (Doc. 64.)

**I.   BACKGROUND**

On June 7, 2019, the Arizona Legislature passed, and the Governor signed into law, House Bill ("HB") 2547, which amended A.R.S. § 5-112 and added § 5-118—statutes related to wagering on horseracing and dog-racing in Arizona. (Mot. Ex. B.) Newly-enacted § 5-112(U) provides that

> any simulcast of live racing into this state that originates from outside this state . . . must be offered to each commercial live-racing permittee in this state and additional wagering facility in this state. Each simulcast agreement executed pursuant to this subsection is subject to approval by [Defendant Arizona Racing] Commission. The Commission shall approve the simulcast

agreement if the Commission determines that the agreement is reasonable and complies with the requirements of this subsection.

The subsection goes on to state that a provider of a simulcast for the purpose of pari-mutuel wagering[1] "may not engage in any anticompetitive or deceptive practice" in offering simulcast contracts by, for example, charging "excessive or unreasonable fees." (Mot. Ex. B.)

Plaintiff Monarch Content Management LLC ("Monarch"), a Delaware LLC, is a purchase and sales agent for more than a dozen out-of-state horse racetracks, including Plaintiff Laurel Racing Association, Inc., dba Laurel Park. The racetracks, including Laurel Park, own the simulcasts of their races, and Monarch has the right to market and sell rights to view the simulcasts and associated content. In Arizona, Monarch has a Simulcast Wagering Contract with TP Racing LLLP, dba Turf Paradise. Under this contract, Monarch provides simulcasts of its out-of-state clients' races as well as access to pari-mutuel pools and real-time betting odds to Turf Paradise's racetrack and its Off-Track Betting ("OTB") sites.

Defendant Arizona Department of Gaming issues permits to racetracks and OTB site operators in Arizona to offer pari-mutuel wagering. Only two entities in Arizona currently hold such permits: Turf Paradise and Arizona Downs. Monarch and Arizona Downs discussed entering into a simulcast wagering contract, but Monarch decided such an agreement was not in its business interests. In 2018, Arizona Downs asked the Commission to consider adopting a rule requiring that all simulcasts entering Arizona for the purpose of pari-mutuel wagering be made available to all permittees. After several public hearings, the Commission took no independent action, but instead the Arizona Legislature enacted HB 2547.

The Legislature established that the statutory provisions of HB 2547 were to go into effect on August 27, 2019. Monarch maintains that it does not want to enter into a simulcast

---

[1] Pari-mutuel wagering is "a system of betting that provides for the distribution among the winning patrons of at least the total amount wagered less the amount withheld under state law." (Compl. ¶ 19.)

wagering contract with Arizona Downs, yet the new statute requires it to either enter into such a contract or stop providing any simulcasts for the purpose of pari-mutuel wagering in Arizona. Monarch filed this lawsuit on August 9, 2019, and filed the present Motion for injunctive relief on August 13, 2019. In the Complaint, Plaintiffs seek a declaration that a portion of HB 2547 is unenforceable because (1) it is preempted by the Interstate Horseracing Act of 1978 ("IHA"), 15 U.S.C. §§ 3001 *et seq.* (Compl. ¶¶ 61–62, 73–75); (2) it compels speech in violation of the First Amendment and Article 2, Section 6 of the Arizona Constitution (Compl. ¶¶ 71–72); (3) it violates the Contract Clause and Article 2, Section 25 of the Arizona Constitution (Compl. ¶¶ 63–67); (4) it violates due process rights under the Fourteenth Amendment by its vagueness and by infringing on the freedom to contract (Compl. ¶¶ 65, 76); and (5) it violates the Dormant Commerce Clause (Compl. ¶¶ 68–70).

## II. LEGAL STANDARD

To obtain a preliminary injunction, a plaintiff must show that "(1) [it] is likely to succeed on the merits, (2) [it] is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in [its] favor, and (4) an injunction is in the public interest." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The Ninth Circuit Court of Appeals, employing a sliding scale analysis, has also stated that "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1078 (9th Cir. 2013) *cert. denied*, 134 S. Ct. 2877 (2014) (quoting *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1132 (9th Cir. 2011)).

## III. ANALYSIS

The Court's analysis begins and ends with the first element of the *Winter* test, namely, Plaintiffs' likelihood of success on the merits of their claims.[2]

---

[2] Plaintiffs ask the Court to strike as unconstitutional only one portion of HB 2547 that they allege applies to them—enforcement of A.R.S. § 5-112(U). (*E.g.* Doc. 20-1, Proposed

### A. Preemption

Plaintiffs first allege that certain statutory provisions contained in HB 2547 are preempted by federal law. The Supremacy Clause of the United States Constitution makes federal law "the supreme law of the land." U.S. Const. art. VI, cl. 2. Federal preemption of state law can be either express or implied. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152–53 (1982). Express preemption occurs when a federal statute contains an explicit preemption provision and the challenged state law provision falls within "the domain expressly preempted by that language." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484 (1996) (internal quotation omitted). There are two types of implied preemption: field preemption and conflict preemption. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001). Field preemption occurs where "the depth and breadth of a congressional scheme . . . occupies the legislative field" in which the challenged state law provision exists. *Id.* Conflict preemption describes a situation in which "compliance with both federal and state regulations is a physical impossibility or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Fid. Fed. Sav.*, 458 U.S. at 152 (internal quotations omitted). An actual, as opposed to hypothetical or potential, conflict must exist for conflict preemption to apply. *Id.*

The Court notes that Plaintiffs challenge HB 2547 on its face. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). After *Salerno*, the Supreme Court later observed, in considering a facial challenge, that "some Members of the Court have criticized the *Salerno* formulation, [but] all agree that a facial challenge must fail

---

Temporary Restraining Order at 7.) Where individual provisions of HB 2547 are "effective and enforceable standing alone and independent" of any unconstitutional provisions, and the valid portions are not so "intimately connected" to any invalid provision as to raise the presumption that the Arizona Legislature would not have enacted the valid provisions without the invalid provisions, HB 2547's invalid provisions would be severable. *See Selective Life Ins. Co. v. Equitable Life Assurance Soc'y of the U.S.*, 422 P.2d 710, 715 (Ariz. 1967). If the Court were to find a likelihood that Plaintiffs will succeed on the merits in challenging the constitutionality of certain individual provisions of HB 2547, the Court must proceed to determine whether the constitutionally infirm provisions are severable from the other provisions of HB 2547.

where a statute has a 'plainly legitimate sweep.'" *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (internal quotations omitted). In deciding a facial challenge, courts "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Id.* at 449–50 (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960)).

Plaintiffs contend that the IHA preempts certain portions of HB 2547. The IHA, enacted by Congress in 1978, maintains that "[t]he States should have primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a)(1). But Congress intervened in a limited fashion to pass legislation "primarily to protect the business of smaller racetracks and horsemen's groups from potential interstate off-track wagering abuses," *Churchill Downs Inc. v. Thoroughbred Horsemen's Group, LLC*, 605 F. Supp. 2d 870, 875 (W.D. Ky. 2009), recognizing that "the unrestricted proliferation of off-track wagering would hurt the horseracing industry by decreasing attendance at racetracks which, in turn, would reduce the number or horses needed to compete and the number of individuals employed in the industry," *Kentucky Div., Horsemen's Benevolent & Protective Ass'n, Inc. v. Turfway Park Racing Ass'n, Inc.*, 20 F.3d 1406, 1414 (6th Cir. 1994).

Section 3003 of the IHA states that "[n]o person may accept any interstate off-track wager except as provided" in the IHA, and § 3004 provides prerequisites for accepting an interstate off-track wager, including that such a wager "may be accepted by an off-track betting system only if consent is obtained from . . . (1) the host racing association [subject to] . . . a written agreement with the horsemen's group . . . ; (2) the host racing commission; [and] (3) the off-track racing commission." 15 U.S.C. §§ 3003, 3004(a). A "host racing association" is "any person who, pursuant to a license or other permission granted by the host state, conducts the horserace subject to the interstate wager." 15 U.S.C. § 3002(9). A "horsemen's group" is "the group which represents the majority of owners and trainers racing [at a particular racetrack], for the races subject to interstate off-track wager on any racing day." 15 U.S.C. § 3002(12).

Plaintiffs argue that conflict preemption applies to A.R.S. § 5-112(U) because that statutory provision requires Monarch to enter into agreements to provide simulcasts of Laurel Park races to all permittees in Arizona, including Arizona Downs, if Monarch wishes to continue to do business in Arizona. However, Laurel Park, as the host racing association, does not consent to off-track wagering at Arizona Downs facilities, and its consent is required under the IHA. Thus, Plaintiffs contend, the requirement to provide simulcasts to all permittees in § 5-112(U) conflicts with the consent requirement in the IHA.

The Court agrees with Defendants that § 5-112(U) does not result in conflict with or contravention of § 3004(a) of the IHA by compelling simulcasts of Laurel Park races to OTB sites in Arizona without the required consent of the host racing association, Laurel Park. Under the state statute, Laurel Park could choose not to consent, in which case its simulcasts would not be provided to any racetracks or OTB sites in Arizona for the purpose of pari-mutuel wagering. The state statute only requires that if a host racing association (or its sales agent) wants to provide simulcasts of horseraces for the purpose of pari-mutuel wagering in Arizona, it must do so to all permittees in Arizona. As such, on the face of § 5-112(U), there is no conflict between it and the IHA, and Plaintiffs have thus failed to demonstrate that § 5-112(U) is facially preempted by the IHA.

**B. Freedom of Speech**

Plaintiffs also claim that HB 2547 compels speech in violation of the First Amendment and Article 2, Section 6 of the Arizona Constitution. Within this claim, Plaintiffs allege that by providing coverage of its horseraces, Laurel Park engages in "both pure speech and expressive conduct" protected by the First Amendment under, for example, *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1058 (9th Cir. 2010). (Mot. at 7.) In addition, Plaintiffs allege that "Monarch is a content provider akin to a cable or satellite provider and exercises editorial discretion in assembling races into its Simulcasts and enhances those Simulcasts by facilitating the inclusion of additional expressive content"—conduct also protected by the First Amendment under *Turner Broadcasting*

*System, Inc. v. Federal Communications Commission*, 512 U.S. 622, 636 (1994). (Mot. at 7–8.) Plaintiffs contend that "HB 2547 plainly compels Monarch and Laurel Park to provide content and to speak" in contravention of the First Amendment. (Mot. at 8.)

In their briefs, the parties provide little analysis as to the threshold question here, that is, the extent to which the terms of A.R.S. § 5-112(U) actually compel Plaintiffs "to provide content and to speak" at all. Section 5-112(U) only addresses "any simulcast of live racing into this state that originates from outside this state," where a simulcast is defined in relevant part as a "telecast shown within this state of live audio and visual signals of horse, harness or dog races . . . for the purpose of pari-mutuel wagering," A.R.S. § 5-101(23). Thus, much of the alleged content and speech to which Plaintiffs refer, both in their briefing and at oral argument, is not contemplated by the statute. By its plain terms, the statute only regulates the provision of telecasts of actual horse (and other) races for the purpose of pari-mutuel wagering in Arizona, not the provision of additional expressive content related generally to "horses, . . . weather, . . . track conditions," and the like (Doc. 71, Oct. 30, 2019, Hr'g Tr. at 18–19), and not the provision of telecasts of horseraces for a purpose other than pari-mutuel wagering.[3]

With the limited scope of the statute in mind, the Court agrees with Defendants' characterization that simulcasts of horseraces for the purpose of pari-mutuel wagering are a form of gambling, "a vice not protected under the Constitution." (Resp. at 10.) The Supreme Court has noted that gambling activity "implicates no constitutionally protected right; rather, it falls into a category of 'vice' activity that could be, and frequently has been, banned altogether" and is properly regulated by a state. *United States v. Edge Broad. Co.*, 509 U.S. 418, 426 (1993).

Plaintiffs analogize this case to *Greater New Orleans Broadcasting Association,*

---

[3] At oral argument, in contending that their simulcasts contain expressive content protected by the First Amendment, Plaintiffs stated that a "television station called TVG . . . is offered to back porches and beer drinkers around the world such that those back-porch watchers and beer drinkers can watch exactly the same simulcast" of horseraces. TVG does not—indeed, TVG could not without authorization by way of a permit under Arizona law—televise horseraces and associated expressive content for the purpose of pari-mutuel wagering in Arizona, and therefore such telecasts do not fall under the statute.

- 7 -

*Inc. v. United States*, 527 U.S. 173 (1999), but that case is distinguishable in an important aspect. There, the Supreme Court concluded that an FCC regulation could not be applied to prohibit advertising messages related to lawful casino gambling in the state in which the gambling was legal, because (in part) the parties conceded that the advertising messages were commercial speech and, as such, eligible for protection under the First Amendment if the messages were not misleading and concern lawful activity and the challenged regulation either did not advance a substantial government interest or was more extensive than necessary to advance that interest. *Id.* at 176, 183–84 (applying *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980)). Here, the object of the challenged statute—simulcasts of horseraces transmitted for the purpose of pari-mutuel wagering—are not commercial speech akin to advertising messages concerning gambling; rather, the simulcasts are inextricably wrapped up in the gambling activity itself, at least under the terms of A.R.S. § 5-112(U).

The Supreme Court has noted on several occasions that conduct does not become speech under the First Amendment simply because the person engaging in the conduct expresses an idea. *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 570 (1991) (upholding an Indiana law requiring nude dancers to wear at least a minimum amount of clothing, noting that simply because a nude dancer may express an idea does not convert the activity into expressive content under the First Amendment and that Indiana has the inherent power to police the "evil" of public nudity). Here, even if the simulcast of a horserace for the purpose of pari-mutuel wagering may express an idea, it is not commercial speech under the First Amendment. As the Court noted above, content other than the actual horserace on which pari-mutuel wagering is conducted is not addressed by the statute, nor is a telecast of a horserace transmitted for a purpose other than pari-mutuel wagering. For these reasons, *Greater New Orleans Broadcasting* is inapposite here.

"The regulation of gambling enterprises lies at the heart of the state's police power," and "[t]he question of how to best regulate gambling activity is . . . one to which different states can arrive at different answers based on their different experiences." *Johnson v.*

*Collins Entm't Co.*, 199 F.3d 710, 720 (4th Cir. 1999). Indeed, in the IHA, Congress explicitly provides that the states "should have the primary responsibility for determining what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a)(1). Because A.R.S. § 5-112(U) addresses only gambling activity and not any expressive content Plaintiffs allege they provide in telecasts, the statute does not implicate any First Amendment right, and Plaintiffs' facial First Amendment challenge to HB 2547 fails.

Plaintiffs also claim that HB 2547 violates Article 2, Section 6 of the Arizona Constitution, and they seek injunctive relief on that additional basis. (Mot. at 9.) As Defendants point out (Resp. at 10 n.6), the Supreme Court has stated that, with regard to "the principles of federalism that underlie the Eleventh Amendment," it would be "difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). Thus, to the extent Plaintiffs' claims under the Arizona Constitution differ in any material way from their claims under the United States Constitution, the Court declines to address the claims under the Arizona Constitution for the purposes of injunctive relief against the state.

### C. Contract Clause

Plaintiffs next claim that HB 2547 violates the Contract Clause of the United States Constitution and Article 2, Section 25 of the Arizona Constitution. The Contract Clause provides, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. Similarly, the Arizona Constitution states that "[n]o . . . law impairing the obligation of a contract, shall ever be enacted." Ariz. Const. art. 2, § 25.

On a number of occasions, the Supreme Court has taken to laying out the scope of protection the Contract Clause provides against a state law amendment. "Generally, we first ask whether the change in state law has 'operated as a substantial impairment of a contractual relationship.' This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the

impairment is substantial." *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992) (internal citations omitted).

Plaintiffs allege that HB 2547 acts to impair Monarch's contract with Turf Paradise by pointing to a single provision of that contract that will be affected. Specifically, Plaintiffs allege that, under the contract, Monarch "has the right to terminate its contract with Turf Paradise while continuing to offer simulcast services to other customers in Arizona," but HB 2547 does not permit Monarch to offer simulcast services to other racetracks or OTB sites in Arizona and not Turf Paradise. (Mot. at 14 & n.4.) However, as Defendants point out, "The contract clause of the Constitution of the United States has reference only to a statute of a state enacted after the making of a contract whose obligation is alleged to have been impaired." *Oshkosh Waterworks Co. v. City of Oshkosh*, 187 U.S. 437, 446 (1903). Monarch has not entered into any agreement to offer simulcast services to customers other than Turf Paradise in Arizona, and Monarch otherwise still has the right to terminate its contract with Turf Paradise after HB 2547 was enacted. Thus, HB 2547 does not impair the term Plaintiffs point to in Monarch's current contract with Turf Paradise at all, let alone substantially impair it.

At best, any impairment is a hypothetical, future one, and that is insufficient to demonstrate a present violation of the Contract Clause. *See Gen. Motors*, 503 U.S. at 187; *Oshkosh Waterworks*, 187 U.S. at 446–47. The Contract Clause does not extend so far as to prohibit states from enacting legislation, particularly related to regulated activities such as gambling, that may affect the parties' expectations or future private contracts, and conversely the Contract Clause does not entitle a party to contract around an existing regulation. *See Hudson Cty. Water Co. v. McCarter*, 209 U.S. 349, 357 (1908); *cf. Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16 (1976) (applying similar reasoning in noting that legislation adjusting rights and burdens does not constitute a due process violation "solely because it upsets otherwise settled expectations"). For these reasons, Plaintiffs are not likely to succeed in demonstrating that HB 2547 impairs Monarch's present contracts in Arizona such that it violates the Contract Clause of the United States Constitution.

### D. Due Process

#### 1. Vagueness

Plaintiffs next claim that HB 2547 violates their due process rights under the Fourteenth Amendment by its vagueness and by infringing on the freedom to contract. Plaintiffs first allege the statute is unconstitutionally vague because "it does not apprise individuals of average intelligence what conduct is prohibited" and does not contain a "clear enforcement mechanism for violation" of A.R.S. § 5-112(U).

The void-for-vagueness doctrine requires that, in enacting a penal statute,[4] a legislature must set guidelines that provide adequate notice to ordinary people as to what conduct is prohibited and that aid in a uniform application of the statute by the government. *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983). A facial challenge to a law that regulates conduct that is not constitutionally protected, as here, succeeds only where the law "is impermissibly vague in all its applications." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–95 (1982). Moreover, where the purpose of a statute is economic regulation, the statute is subject to a "less strict vagueness test." *Id.* at 498.

Here, Plaintiffs argue specifically that the provision in A.R.S. § 5-112(U) stating that the Arizona Racing Commission shall approve a simulcast agreement if it determines "the agreement is reasonable and complies with the requirements of this subsection" is impermissibly vague, because the Commission has discretion as to whether an agreement is "reasonable" and the subsection's "requirements" are unclear. (Mot. at 10.) Plaintiffs also point to provisions in § 5-112(U) prohibiting "anticompetitive or deceptive practices," including charging an "excessive or unreasonable rate," as insufficiently clear to provide notice to an ordinary person of the prohibited conduct. (Mot. at 10.)

Under § 5-112(U), the Commission is to approve a simulcast agreement if it is "reasonable and complies with the requirements of this subsection." A reasonableness standard is found throughout the statutory and common law, and legal standards such as an

---
[4] HB 2547 includes possible criminal sanctions for "any person who violates this article with respect to wagering or betting." A.R.S. § 5-112(K).

- 11 -

"unreasonably low price[] for the purpose of destroying competition or eliminating a competitor," generally withstand an ambiguity challenge. *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 34 (1963). Such is the case here. At oral argument, Plaintiffs posed a hypothetical in which Monarch enters into a contract to provide simulcasts to Arizona Downs to comply with the statute, and Arizona Downs materially breaches the contract. (Oct. 30, 2019, Hr'g Tr. at 15–16.) Plaintiffs asked if, under the portion of § 5-112(U) requiring Monarch to offer simulcasts to all permittees in Arizona, Monarch would then violate the statute if it terminated the agreement with Arizona Downs on account of the breach. The statute's reasonableness requirement leads to an answer in the negative; an agreement with a party that is, for example, incapable of paying under the terms of the agreement would not be reasonable.

The "requirements" of § 5-112(U) are also sufficiently clear for the purposes of both the Commission and the regulated entities. The subsection provides specific examples of instances in which the Commission may find "anticompetitive or deceptive" practices, including (1) charging "excessive or unreasonable fees for the right to receive the interstate simulcasts"; (2) entering into an agreement or joint enterprise with another racetrack to bundle signals for the purpose of "securing an excessive or unreasonable fee" for simulcasts; and (3) "any other activity with the purpose or effect of artificially inflating prices beyond reasonable market rates." A.R.S. § 5-112(U). The subsection also states that, to determine "whether a fee is excessive or unreasonable, the Commission shall consider prevailing rates paid for comparable simulcast signals in the past, prevailing rates paid outside this state and whether any commonality of ownership or revenue sharing exists, partially or wholly, between the permittee in this state and the entity receiving the simulcast fee." A.R.S. § 5-112(U)(1). Even if the statute gives the Commission discretion in evaluating simulcast agreements, the subsection does not suffer from a lack of clarity on its face such that an ordinary person is not on notice as to what constitutes an anticompetitive or deceptive practice. This is particularly true where, as here, the purpose of the statute is in large part economic regulation, and HB 2547 is thus subject to a "less

strict vagueness test." *See Vill. of Hoffman Estates*, 455 U.S. at 498. As a result, Plaintiffs' facial void-for-vagueness challenge of HB 2547 fails.

### 2. Freedom to Contract

Citing Supreme Court cases from 1897 to the early part of the 1900s, Plaintiffs next raise a substantive due process claim by arguing that the purpose of HB 2547 is so irrational that it infringes on the liberty to contract and to not contract. (Mot. at 11.) In modern case law, "legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality," and "the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery*, 428 U.S. at 15 (citations omitted); *see also Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 637 (1993). Plaintiffs have not demonstrated that the Arizona Legislature acted irrationally in enacting HB 2547; indeed, on its face, the statute creates equal access among racetracks and OTB permittees in Arizona to simulcasts for the purpose of pari-mutuel wagering—an activity the state has a strong interest in regulating, as the Court detailed above. As a result, Plaintiffs have not shown a likelihood of success on the merits of their substantive due process challenge to HB 2547.

### E. Commerce Clause

Finally, Plaintiffs claim that certain provisions of HB 2547 run afoul of the Dormant Commerce Clause. The United States Constitution expressly grants to Congress the authority to "regulate Commerce with foreign Nations, and among the several states." U.S. Const. art. I, § 8, cl. 3. The "dormant" aspect of the Commerce Clause is that which reserves to Congress the authority to regulate interstate commerce even if Congress has not acted on that authority. Thus, the Commerce Clause implicitly limits a state's authority to regulate if interstate commerce is implicated. Conversely, "[w]hen Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause." *Ne. Bancorp, Inc. v. Bd. of Governors*, 472 U.S. 159, 174 (1985).

Plaintiffs argue that HB 2547 is an improper extraterritorial regulation by Arizona that discriminates against out-of-state companies and unduly burdens interstate commerce. To begin with, in the IHA, Congress expressly authorized the states to "determin[e] what forms of gambling may legally take place within their borders." 15 U.S.C. § 3001(a)(1). Furthermore, the IHA permits interstate off-track wagering only if consent is obtained from the relevant state authorities as well as the host racing association and horsemen's group. 15 U.S.C. §§ 3003, 3004(a). Thus, Congress explicitly authorized the state actions that Plaintiffs complain of here—regulation by Arizona authorities of interstate off-track wagering in Arizona—and the actions do not run afoul of the Commerce Clause. *Ne. Bancorp*, 472 U.S. at 174.

A Dormant Commerce Clause challenge to a state action requires a showing that the state unjustifiably discriminated against out-of-state businesses for the benefit of domestic businesses or imposed a burden on interstate commerce that clearly exceeded the local benefits. *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338–39 (2008). Even if Congress had not plainly authorized state regulation of interstate off-track wagering in the IHA, HB 2547 on its face does not discriminate against out-of-state entities. The provisions of HB 2547 plainly state that any simulcast provider of horseraces originating in Arizona for the purpose of pari-mutuel wagering must comply with the same requirements—including offering simulcasts to all live-racing and OTB permittees under a reasonable agreement as determined by the Racing Commission—as simulcast providers of horseraces originating outside of Arizona for the purpose of pari-mutuel wagering. *Compare* A.R.S. § 5-112(T) (addressing simulcasts of horseracing originating in Arizona for the purpose of wagering) *and* A.R.S. § 5-112(U) (addressing simulcasts of horseracing originating outside Arizona for the purpose of wagering).

And Plaintiffs have not demonstrated that, by its plain terms, HB 2547 imposes an excessive burden on interstate commerce. Plaintiffs principally argue that HB 2547 creates an excessively undue burden by requiring "that all interstate simulcast providers either make their product and services available to every racing permittee in this state—

irrespective of size, ability to pay, or prior business relationships—or to not do business in Arizona *at all*." (Mot. at 13.) To reiterate what the Court has already stated, all simulcast providers for the purpose of pari-mutuel wagering, whether in Arizona or not, must comply with the same requirements, and Arizona has explicit authority to regulate interstate wagering that takes place within its borders. The fact that Plaintiffs may or may not want to enter into an agreement with certain live racing or OTB permittees in Arizona does not demonstrate that HB 2547 on its face somehow places an undue burden on interstate commerce as a whole. *See, e.g.*, *Yakima Valley Hosp. v. Wash. State Dep't of Health*, 731 F.3d 843, 847 (9th Cir. 2013) (stating the challenged regulations "do not treat in-state and out-of-state actors differently, nor are they an even-handed law that incidentally makes it harder for out-of-state actors to do business in the state" and that "meager allegations" that the regulations will deter the plaintiff's business in the state "do not show that the challenged regulations impede those interstate transactions in general"). For all these reasons, Plaintiffs have failed to demonstrate a likelihood of success on the merits on their Commerce Clause challenge to HB 2547.

When "a plaintiff has failed to show the likelihood of success on the merits, we need not consider the remaining three" *Winter* elements for obtaining preliminary injunctive relief. Because Plaintiffs have failed to show a likelihood that they will succeed on the merits of any of their claims, the Court must deny Plaintiffs' request for preliminary injunctive relief.

**IT IS THEREFORE ORDERED** denying Plaintiffs' Application for Temporary Restraining Order with Notice (Doc. 20) and the associated request for a Preliminary Injunction.

Dated this 20th day of December, 2019.

Honorable John J. Tuchi
United States District Judge

- 15 -